IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |  |
|---|---|---|
| DENNIS MILLER, | ) | |
| | ) | CASE NO. 1:13-CV-1872 |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KENNETH S. McHARGH |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | MEMORANDUM OPINION & ORDER |
| | ) | |
| Defendant. | ) | |

This case is before the Magistrate Judge pursuant to the consent of the parties. (Doc. 15). The issue before the undersigned is whether the final decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Dennis Miller's ("Plaintiff" or "Miller") application for Supplemental Security Income benefits under Title XVI of the Social Security Act, 42 U.S.C. § 1381 *et seq.*, is supported by substantial evidence and, therefore, conclusive.

For the reasons set forth below, the Court VACATES the Commissioner's decision and REMANDS the case back to the Social Security Administration.

## I. PROCEDURAL HISTORY

Miller filed an application for Social Security Income benefits on October 29, 2009. (Tr. 154-55). Plaintiff alleged he became disabled on November 1, 1998 due to suffering from bipolar disorder, attention deficit disorder, severe depression, and a low back injury. (Tr. 175). The Social Security Administration denied Plaintiff's application on initial review and upon reconsideration. (Tr. 83-85, 93-99).

At Plaintiff's request, administrative law judge ("ALJ") Traci Hixson convened an administrative hearing on July 19, 2011 to evaluate his application. (Tr. 44-80). Plaintiff,

1

represented by counsel, appeared and testified before the ALJ. (*Id*).  A vocational expert ("VE"), Mark Anderson, also appeared and testified. (*Id*.).

On February 24, 2012, the ALJ issued an unfavorable decision, finding Miller was not disabled. (Tr. 12-28).   After applying the five-step sequential analysis,[1] the ALJ determined Plaintiff retained the ability to perform work existing in significant numbers in the national economy. (*Id*.).  Subsequently, Plaintiff requested review of the ALJ's decision from the Appeals Council. (Tr. 8).  The Appeals Council denied the request for review, making the ALJ's February 2012 determination the final decision of the Commissioner. (Tr. 1-3).   Plaintiff now seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 1383(c).

---

[1] The Social Security Administration regulations require an ALJ to follow a five-step sequential analysis in making a determination as to "disability." *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The Sixth Circuit has summarized the five steps as follows:

(1)     If a claimant is doing substantial gainful activity–i.e., working for profit–she is not disabled.

(2)     If a claimant is not doing substantial gainful activity, her impairment must be severe before she can be found to be disabled.

(3)     If a claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

(4)     If a claimant's impairment does not prevent her from doing her past relevant work, she is not disabled.

(5)     Even if a claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that accommodates her residual functional capacity and vocational factors (age, education, skills, etc.), she is not disabled.

*Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990); *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).

## II. EVIDENCE

### A.  Personal Background Information

Plaintiff was born on June 30, 1971, and was 40 years old on the date the ALJ rendered her decision, making him a "younger person," ages 18 to 49, for Social Security purposes. 20 C.F.R. § 416.963(d).  Miller completed a GED and has no past relevant work. (Tr. 49, 181).

### B.  Medical Evidence[2]

#### 1.  Physical Impairments

In 1998, Miller injured his back during a work-related accident. (Tr. 328).  Between July 2000 and November 2001, he underwent three surgeries on his back, including fusions and the implantation of spinal hardware. (*Id.*). On November 25, 2003,  Hong Shen, M.D., examined Plaintiff, and observed an antalgic gait, a significantly decreased range of motion in the lumbar spine, but normal strength and reflexes in the lower extremities, and a negative straight leg raise. (Tr. 329).  Dr. Shen recommended a spinal cord stimulator, but Plaintiff was not amenable, so Dr. Shen recommended acupuncture therapy as an alternative. (*Id.*).   In December 2003, Jerold Gurley, M.D., recommended that Miller continue chronic pain management, be evaluated for a dorsal column stimulator, and attend job retraining or vocational rehabilitation. (Tr. 321).  A physical therapy note from April 29, 2004 indicates that Plaintiff was discharged because he was non-compliant. (Tr. 788).  Of nine scheduled appointments, Miller cancelled, or otherwise failed to attend, six sessions. (*Id.*).

Between 2002 and 2004, several physicians examined Plaintiff in support of a workers' compensation claim and rendered opinions regarding his functional limitations. In February 2004, Gordon Zellers, M.D., restricted Miller to a reduced range of sedentary work. (Tr. 1135-

---

[2] The following recital of Plaintiff's medical record is an overview of the medical evidence pertinent to Plaintiff's appeal.  It is not intended to reflect all of the medical evidence of record.

1140).  Dr. Zellers opined that Plaintiff could lift a maximum of five pounds occasionally; could not sit, stand, or ambulate for prolonged periods of time; could not climb, bend, or perform repetitive activities involving the lower extremities; and could squat occasionally. (Tr. 1140).  In October 2004, Karl Metz, M.D., determined that Plaintiff was limited to sedentary activity that did not require him to stand or sit for more than "brief periods" of time. (Tr. 624-27, 761).  Dr. Metz also recommended that Miller lift no more than 15 to 20 pounds occasionally and perform no repetitive bending, kneeling, or squatting. (Tr. 627, 761).  He opined that Dr. Zellers's opinion was a reasonably accurate assessment of Miller's abilities. (Tr. 761).

During November 2004, Edward Covington, M.D., of Cleveland Clinic's pain medicine department, evaluated Miller. (Tr. 611-13).  Dr. Covington stated that Miller had been disabled since 1999 and his social, recreational, and home activities were severely impaired. (Tr. 612).  Dr. Covington diagnosed lumbar sprain, lumbar disc herniation, lumbar post-laminectomy syndrome, and a contusion of the leg. (Tr. 613).

Around April 2005, healthcare providers commented that Plaintiff's fusions had consolidated well, his spinal instrumentation was in good position, and there was no evidence of implant failure. (Tr. 603).  In September 2006, Plaintiff underwent a procedure to remove the hardware that had been placed in his spine. (Tr. 297, 1313).  In October 2006 following the removal, Louis Keppler, M.D., opined that Miller was doing well, and films showed an "excellent fusion." (Tr. 743).  Dr. Keppler stated that Miller was in a "markedly deconditioned state" and would benefit from physical therapy. (*Id.*).

Antony George, M.D., served as Miller's primary care physician since 2004, and provided pain management care for Plaintiff's back impairments.  On October 8, 2009, Dr.

George noted low back pain, spasms, and decreased range of motion; the doctor prescribed Percocet. (Tr. 1323).

During an October 2009 motorcycling accident, Miller fractured and dislocated his right wrist. (Tr. 1283). On October 23, 2009, Plaintiff underwent surgery to repair the distal radial fracture, and his wrist was casted. (Tr. 1279). As to the surgery, Amir Nagavi, M.D., noted that reduction of the fracture was accomplished. (Tr. 1286). After the procedure, films showed continued poor alignment and joint dislocation, but Plaintiff was unwilling to undergo additional operative repair. As a result, Dr. Nagavi discharged him with a plan for outpatient surgery. (*Id.*).

Around November 5, 2009, Plaintiff presented to St. John's emergency room, stating that the cast on his right wrist caused swelling and numbness in his fingers. (Tr. 1437). The cast was revised. (Tr. 1438-40). Soon after, Plaintiff returned to St. John's complaining that the new cast felt tight. (Tr. 1426-27). A November 9, 2009 treatment note from Jacob Bosely, M.D., of MetroHealth indicates that Plaintiff had been non-compliant with wearing his cast, and had previously presented to another hospital, St. John's, where the cast was bi-valved. (Tr. 1279). A December 7, 2009 x-ray of Miller's right wrist showed a successful reduction of the fracture with internal fixation by a plate and screw device in good position. (Tr. 1388).

In December 2009, Miller complained to Dr. George of constant low back and right leg pain, a sore wrist, and tingling in his toes. (Tr. 1537). Dr. George noted that Miller had gained weight and was not exercising. The doctor recommended that Miller begin work. (*Id.*). On January 6, 2010, Dr. George again encouraged Plaintiff to exercise. (Tr. 1536). On January 14, 2010, Plaintiff reported to Dr. George that he was feeling better, attending spinning classes at a local health club three times per week, and performing some home exercises. (Tr. 1534). On

February 11, 2010, Dr. George opined that Miller's back condition was "stable," and he was taking Methadone and Percocet. (Tr. 1531).

On February 16, 2010, Plaintiff underwent a second surgery on his wrist. (Tr. 1512). Notes from the attending surgeon, Kevin Malone, M.D., indicate that prior to surgery, Miller had presented to other medical centers with his splints removed or adjusted. Dr. Malone informed Plaintiff that the fracture was difficult to fix and much of the outcome was based on Plaintiff's noncompliance and activity level. (*Id.*). The surgery removed current hardware, revised the open reduction and internal fixation of the fracture to the distal radius, and applied new hardware. (*Id.*). A March 25, 2010 x-ray of the wrist showed some healing and hardware intact. (Tr. 1493). There was narrowing of the radiocarpal joint space with widening of the joint space between the lunate and scaphoid carpal bones. (*Id.*).

In March 2010, state agency physician W. Jerry McCloud, M.D., conducted a review of the medical record. (Tr. 1476-1482). He opined that Plaintiff could lift up to 20 pounds occasionally and 10 pounds frequently, stand for up to 6 hours in an 8 hour workday, and sit for up to 6 hours in an 8 hour work day, if he could alternate positions once every hour. (Tr. 1476). Dr. McCloud precluded Miller from pushing, pulling, or using foot controls with his right lower extremity, and climbing, ladders, ropes and scaffolds. (Tr. 1476-77). Miller could occasionally climb ramps and stairs, kneel, and crawl. (Tr. 1477). Due to his wrist fracture and pain, Miller could occasionally use the right arm and hand for handling or fingering. (Tr. 1478).

During March 2010, Dr. George noted tenderness and spasms in Plaintiff's back. (Tr. 1528). On April 1, 2010, Miller told Dr. George he experienced constant low back pain and wrist pain, and was limited in his activities, including, bending, carrying and lifting. (Tr. 1525).

On April 12, 2010, about eight weeks after his second wrist surgery, Plaintiff presented to Amar Mutnal, M.D., of MetroHealth Systems ("Metrohealth") regarding some continued wrist pain. (Tr. 1501). Dr. Mutnal noted healing at the surgery site, with mild swelling and pain with range of motion, which was limited. The doctor instructed Miller to continue wearing a wrist brace, and recommended radiocarpal fusion if pain continued with conservative measures. However, the surgery would not be performed unless Plaintiff stopped smoking, because smoking would impair bone healing. (*Id.*). In May 2010, Tamer Ahmed-Said, M.D., of MetroHealth agreed with Dr. Mutnal's recommendations. (Tr. 1600-01).

On April 16, 2010, Plaintiff went to the emergency room for severe low back pain and numbness in the right foot. (Tr. 1733-36). Plaintiff indicated to emergency room personnel that he had started landscaping. (Tr. 1735). A physical examination showed tenderness in the low back, but was otherwise normal. (Tr. 1734). Plaintiff's reflexes and gait were unremarkable, and he displayed no apparent motor or sensory deficits. (*Id.*). In May 2010, Plaintiff reported to Dr. George that he was performing law mowing services, but experienced leg and low back pain, and tingling in his right foot. (Tr. 1522). Dr. George noted tenderness, spasms, and a limited range of motion, and prescribed Methadone and Percocet. (*Id.*).

On June 7, 2010, Plaintiff treated with Aphrodite Papadakis, M.D., at MetroHealth. (Tr. 1596). He complained of leg swelling that was not alleviated with elevation, chronic back pain, and numbness in the fingers of his right hand. (*Id.*). Dr. Papadakis diagnosed edema, which he opined was likely a side effect of Lamictal, and recommended a trial of Lasix. (Tr. 1598). The doctor referred Plaintiff to orthopedics for his hand numbness and pain management for low back pain, though he noted Plaintiff's history of drug abuse. (*Id.*).

7

On June 14, 2010, Plaintiff presented to the emergency room with complaints of swelling in his legs, intermittent chest pain, a wound to the lower left extremity, and left forearm numbness. (Tr. 1957). A physical examination showed edema and an ulcer on the left leg, near the ankle. (Tr. 1957). Miller was treated for a leg abscess and cellulitis, and discharged the following day in stable condition. (Tr. 1957-58).

On June 29, 2010, state agency physician Gerald Klyop, M.D., reviewed an updated version of the record and affirmed Dr. McCloud's opinion. (Tr. 1658).

On July 16, 2010, Plaintiff presented to MetroHealth and was treated by Kellie Atlas, CNP, for numbness in both hands. (Tr. 1665). The wound on Miller's left leg was open and infected. (*Id.*). After examination, Ms. Atlas noted no significant clinical findings regarding Miller`s reported hand numbness and tingling, and referred him to a hand clinic. (Tr. 1668). She also referred Miller to general surgery to undergo stiches for his leg wound. Regarding Plaintiff's leg edema, Ms. Atlas recommended Plaintiff retry Lasix, elevate his feet, wear supportive shoes, and avoid prolonged standing and crossing his legs. Dr. Tolentino examined Plaintiff's wound and agreed with the referral to general surgery. (*Id.*).

On July 27, 2010, Plaintiff presented to Dr. Brendan Astley at MetroHealth for constant, severe low back pain and muscle spasms. (Tr. 1661). Miller was taking two Methadone and six Percocet daily. Plaintiff reported that he could stand for 20 minutes, sit for 30 minutes, and walk for 20 minutes. (*Id.*). Upon physical examination, flexion in the lumbar spine was not painful, but extension was mildly painful. (Tr. 1662). There was tenderness to palpation on the right side of the lumbar spine. (*Id.*). However, Miller's sensation, reflexes, and strength were normal in all four extremities. (*Id.*). Dr. Astley diagnosed lumbar spondylosis, lumbar radiculopathy, and post-laminectomy syndrome. (Tr. 1662-62). The doctor prescribed pool therapy, smoking

cessation, weight control, Methadone, and Percocet. (Tr. 1663).  Dr. Astley opined that spinal nerve blocks could be beneficial. (*Id.*).

On August 17, 2010, Plaintiff underwent an x-ray of the right wrist. (Tr. 1681).  As compared to the March 2010 x-ray, the imaging showed no acute fracture. There was widening of the scapholunate interval and proximal migration of the mid carpal row, as well as, anterior subluxation of the carpus.  The impression was progression of findings associated with scapholunate ligament disruption. (*Id.*).  There do not appear to be further treatment records related to Plaintiff's right wrist.

On September 29, 2010, Plaintiff fractured his left femur in an automobile accident. (Tr. 1809).  Thereafter, Miller underwent surgery. (Tr. 1930).  A November 2010 x-ray showed the rod in Plaintiff's femur had broken. (Tr. 1807, 1809).  During March 2011, Plaintiff underwent a procedure to remove the broken rod and insert an antibiotic rod. (Tr. 1809).  Miller was discharged to a nursing facility for six weeks to receive antibiotic treatment. (*Id.*).  On April 21, 2011, Miller underwent surgery to remove the implant and further repair the injury. (Tr. 2058, 2093).  On April 23, 2011, Miller was discharged. (Tr. 2073).  Plaintiff followed up with Brendan Patterson, M.D., on June 8, 2011. (Tr. 2095).  Miller had a reduced range of motion and crepitus around the left knee, but his leg otherwise was well aligned, there was no varus instability, and there was intact motor and sensory function in the left foot. (*Id.*).  Dr. Patterson noted that Miller was consuming a disproportionate amount of narcotic medication and agreed to provide only one more prescription. (Tr. 2095-96).

Miller had not undergone rehabilitation for his left leg by the July 2011 administrative hearing. (Tr. 63).  He began walking without crutches four or five weeks prior to the hearing, and continued to use crutches to walk when his leg was doing poorly. (Tr. 64, 68-69).

## 2. Mental Impairments

Miller received psychiatric care from the Far West Center beginning around 2003. (Tr. 600). On May 2, 2005, Sara Zuchowski, M.D., indicated that she was currently treating Miller for persistent depressed mood. In the past, Miller had received treatment from the Far West Center for bipolar disorder and attention deficit disorder ("ADD"). (*Id.*).

On September 18, 2009, Miller reported to Dr. Zuchowski that he was grieving over his grandfather's recent death. (Tr. 1370). Plaintiff denied the use of cocaine and alcohol, and did not report suicidal ideation. Dr. Zuchowski observed an appropriate affect, and fair insight and judgment. Miller stated that he did not like being around people and was unsure of how to enter a career or find a job. (Tr. 1657). Dr. Zuchowski continued Plaintiff's psychotropic medication and prescribed counseling. (*Id.*).

A mental health assessment form explained that Plaintiff responded fairly to treatment, but still had periods of depression. (Tr. 1377). Miller also had a low tolerance for stress and difficulty working with and being around others. However, he was capable of managing benefits. Plaintiff's diagnosis was bipolar disorder. Miller's prognosis was deemed limited, due to chronic pain and limited physical ability.

On January 5, 2010, Plaintiff described his depression to Dr. Zuchowski. (Tr. 1656). Dr. Zuchowski opined that Miller had good eye contact, normal speech, relevant thought process, fair insight and judgment, and no suicidal or homicidal ideation. (*Id.*).

On January 31, 2010, state agency consultant Mel Zwissler, Ph.D., conducted a review of the record and opined as to Plaintiff's mental residual functional capacity. (Tr. 1471-73). Dr. Zwissler recommended that Miller retained the ability to understand, remember, and carry out simple, repetitive tasks, and was sufficiently able to attend and concentrate. Dr. Zwissler also

10

opined that Plaintiff may be best suited for situations without strict production quotas, unexplained changes, or working closely with others. (Tr. 1473).

During March 2010, Plaintiff reported mourning the death of his father and visiting his mother daily. (Tr. 1654). Miller said that he tolerated Effexor and was feeling "ok." Dr. Zuchowski described Miller as displaying good eye contact, a relevant thought process, less depression, and better insight and judgment. Miller reported no aggression or suicidal ideation. She prescribed Restoril as a sleep aid and Dexedrine for ADD.

On April 23, 2010, Plaintiff reported that he was taking online classes, because he was uncomfortable in the classroom setting and experienced difficulty being around crowds. (Tr. 1652). Miller felt that Dexedrine helped him focus and concentrate. Dr. Zuchowski indicated that Plaintiff's mood was well. (*Id.*). She opined that Miller was alert and cooperative, and his speech was clear and spontaneous. (Tr. 1653). Additionally, Plaintiff's thoughts were relevant and goal-directed, insight and judgment better, and temper improved. (*Id.*). The doctor adjusted medication to further improve focus and sleep. (Tr. 1652).

During June 2010, Miller stated that he was more focused and continued to participate in internet classes. (Tr. 1798). Plaintiff had stopped Restoril, because he felt it was not improving his sleep, and he planned to attend a sleep study. (*Id.*). Dr. Zuchowski described Miller as having an appropriate affect, appropriate insight and judgment, no thought agitation, and good eye contact. (Tr. 1799).

On July 1, 2010, state agency physician Bonnie Katz, Ph.D., conducted a review of the updated record. (Tr. 1659). Dr. Katz affirmed Dr. Zwissler's assessment. (*Id.*).

### III. SUMMARY OF THE ALJ'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant has not engaged in substantial gainful activity since October 29, 2009, the application date.

2. The claimant has the following severe impairments: lumbar degenerative disc disease, status post left femoral fracture and open reduction internal fixation procedure, and bipolar disorder.

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. 416.967(b), with restrictions. Specifically, he can lift 20 pounds occasionally and 10 pounds frequently. In an eight-hour workday, he can sit for six hours and stand and/or walk for six hours, but must be permitted to alternate between sitting and standing for five minutes every hour. He can occasionally balance, bend, climb ramps or stairs, push and pull with the lower extremities. He cannot kneel or crawl. He must avoid humidity. He can handle, finger, feel, and reach in all directions. The claimant is limited to simple, routine tasks with simple, short instructions and simple, work-related decisions. He is limited to tasks in an environment with few workplace changes. He cannot perform work involving more than minimal contact with the public or more than superficial interaction with co-workers and supervisors.

5. The claimant has no past relevant work.

6. The claimant was born on June 30, 1971 and was 38 years old, which is defined as a younger individual age 18-49, on the date the application was filed.

7. The claimant has at least a high school education and is able to communicate in English.

   . . .

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

10. The claimant has not been under a disability, as defined in the Social Security Act, since October 29, 2009, the date the application was filed.

(Tr. 14-28) (internal citations omitted).

## IV. DISABILITY STANDARD

A claimant is entitled to receive Disability Insurance and/or Supplemental Security Income benefits only when she establishes disability within the meaning of the Social Security Act. *See* 42 U.S.C. §§ 423, 1381. A claimant is considered disabled when she cannot perform "substantial gainful employment by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve (12) months." *See* 20 C.F.R. §§ 404.1505, 416.905.

## V. STANDARD OF REVIEW

Judicial review of the Commissioner's benefits decision is limited to a determination of whether, based on the record as a whole, the Commissioner's decision is supported by substantial evidence, and whether, in making that decision, the Commissioner employed the proper legal standards. *See Cunningham v. Apfel*, 12 F. App'x 361, 362 (6th Cir. 2001); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984); *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "Substantial evidence" has been defined as more than a scintilla of evidence but less than a preponderance of the evidence. *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981). Thus, if the record evidence is of such a nature that a reasonable mind might accept it as adequate support for the Commissioner's final benefits determination, then that determination must be affirmed. *Id.*

The Commissioner's determination must stand if supported by substantial evidence, regardless of whether this Court would resolve the issues of fact in dispute differently or substantial evidence also supports the opposite conclusion. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). This Court may not try the case de novo, resolve conflicts in the evidence, or decide questions of credibility. *See*

*Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). However, it may examine all the evidence in the record in making its decision, regardless of whether such evidence was cited in the Commissioner's final decision. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).

## VI. ANALYSIS

### A. The ALJ's Finding at Step Three

At the third step of the disability evaluation process, the ALJ must evaluate whether the claimant's impairments satisfy the requirements of any of the medical conditions enumerated in the Listing of Impairments within 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R §§ 416.920(a)(4)(iii), 404.1520(a)(4)(iii); *Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 491 (6th Cir. 2010). The Listing of Impairments recites a number of ailments which the Social Security Administration has deemed "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. §§ 416.925(a), 404.1520(a). Each listing describes "the objective medical and other findings needed to satisfy the criteria of that listing." 20 C.F.R. §§ 416.925(c)(3), 404.1520(c)(3).

In order to "meet" a listing, the claimant must satisfy all of the listing's requirements. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 653 (6th Cir. 2009). However, if the claimant does not meet all of the listing's requirements, he may still be deemed disabled at this stage if his impairments "medically equal" the listing. 20 C.F.R. §§ 416.926(b)(3), 404.1526(b). To do so, the claimant must present "medical findings" that show his impairment is "equal in severity to *all* the criteria for the one most similar listed impairment." *Sullivan v. Zebley*, 493 U.S. 521, 531, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990) (emphasis in original).

At Step Three of the analysis in the instant case, the ALJ held that Miller's lumbar degenerative disc disease did not meet or equal Listing 1.04A. (Tr. 15).  In relevant part, the listing reads as follows:

> 1.04  Disorders of the spine (e.g. herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equine) or the spinal cord.  With:
>
> A.  Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

20 C.F.R. Pt. 404, Sbpt P, App. 1, § 1.04.  The Regulations also require that abnormal findings be established over a period of time: "Because abnormal physical findings may be intermittent, their presence over a period of time must be established by a record of ongoing management and evaluation." 20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.00D; *Booth v. Comm'r of Soc. Sec.*, No. 1:06-CV-122, 2008 WL 744230 (S.D. Ohio Mar. 19, 2008).

Plaintiff asserts that, though his symptoms were intermittent, they persisted over time such that they fulfilled the listing.  Miller cites to an array of medical evidence in an effort to show that he met the various requirements of the listing.  However, Miller's argument is insufficient.  Ultimately, Plaintiff carries the burden to demonstrate he meets all of the criteria of Listing 1.04. *See Grier v. Comm'r of Soc. Sec.*, No. 1:12-CV-02118, 2013 WL 3934176 (N.D. Ohio July 30, 2013).  Beyond pointing to evidence that pre-dates the filing of the application, Plaintiff's brief makes no argument regarding the existence of objective medical findings that would meet or equal the listing thereafter. *Id.*; *see also Casey v. Sec. of Health and Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993) (The proper inquiry for SSI claims is whether the claimant was disabled on or after the application filing date.).  In addition, after the application was filed

15

in October 2009, providers found Plaintiff's reflexes and senses were normal. (Tr. 1734). During July 2010, Plaintiff again had intact sensation and full strength in his lower extremities. (Tr. 15, 1662). Miller has not pointed to evidence showing that his impairment continued to meet or equal the listing after he filed his application. Consequently, this challenge to the ALJ's listing finding lacks merit.

Plaintiff also requests a remand to obtain medical expert testimony regarding the listing. Miller cites to 20 C.F.R. § 404.1527(e)(2)(iii), which gives the ALJ the discretion to ask for and consider opinions from experts on the issue of medical equivalency. Social Security Ruling 96-6p also advises:

> [L]ongstanding policy requires that the judgment of a physician (or psychologist) designated by the Commissioner on the issue of equivalence on the evidence before the administrative law judge . . . must be received into the record as expert opinion evidence and given appropriate weight.

The signature of a state agency medical consultant on a Disability Determination and Transmittal Form ensures that consideration by a physician designated by the Commissioner has been given to the issue of medical equivalency at the initial and reconsideration levels of administrative review. *Id.* Additional medical expert evidence is required under two circumstances, both of which are discretionary: (1) "When no additional medical evidence is received, but in the opinion of the administrative law judge . . . the case record suggest[s] that a judgment of equivalence may be reasonable;" or (2) "When additional medical evidence is received that in the opinion of the administrative law judge . . . may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity." SSR 96-6p, 1996 WL 374180, at *4.

The Sixth Circuit addressed this issue in *Curry v. Secretary of Health & Human Services*. No. 87-1779, 1988 WL 89340, at *4-5 (6th Cir. 1988) (unpublished). Curry argued that the ALJ

should have retained a medical expert to testify as to whether his impairments combined to medically equal a listed impairment. *Id.* at *4. The Sixth Circuit rejected this argument. *Id.* at *5. The court held, *inter alia*, that because two state agency experts had considered whether the claimant's impairments medically equaled any listing, it was not necessary for the ALJ to secure the opinion of another medical expert to testify on the issue. *Id.* Accordingly, it upheld the Commissioner's decision that Curry's impairments did not meet or equal any listing. *Id.*

Here, the signatures of state agency physicians Drs. McCloud and Klyop appear on the Disability Determination and Transmittal Forms at the initial and reconsideration levels. (Tr. 81-82). Miller does not argue that the ALJ abused her discretion, that new evidence warranted the need for further consideration, or that the ALJ found a finding of equivalency reasonably likely. Accordingly, Plaintiff's argument for expert testimony is not well-taken.

### B. The ALJ's Assessment of Medical Opinion Evidence

Plaintiff maintains that the ALJ's treatment of various medical opinions violated the treating source doctrine. The Court will address each medical opinion in turn.

#### 1. Drs. Metz, Covington, and Zellers

Plaintiff alleges that the ALJ either failed to address or inadequately treated the opinions issued by Drs. Zellers and Metz,[3] who examined Plaintiff during February and October of 2004 in connection with a workers' compensation claim. Further, Miller asserts that the ALJ failed to properly assess an opinion issued by Dr. Covington in November 2004, after an examination at the Cleveland Clinic.

Although Plaintiff characterizes these physicians as "treating sources," he is incorrect. Generally, a "nontreating source," has examined the claimant "but does not have, or did not

---

[3] Plaintiff mistakenly refers to Dr. Metz as Dr. Katz. (Plaintiff's Brief at 17).

have, an ongoing treatment relationship with" her. *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) (*quoting* 20 C.F.R. § 404.1502). A "treating source" has not only examined the claimant but also has an "ongoing treatment relationship" with her consistent with accepted medical practice. *Id.*

Here, the physicians at issue examined Miller on only one occasion before rendering their opinions, making them non-treating but examining sources. One-time treatment cannot establish the type of ongoing relationship required by the Regulations, and accordingly, does not trigger treating source review. *Id.* As a result, Plaintiff's argument that the ALJ's treatment of these physicians violated the doctrine must fail.

As to Dr. Metz, Plaintiff more specifically asserts that the ALJ failed to account for the doctor's bending limitation in the RFC. Dr. Metz opined that Plaintiff should not perform "repetitive bending," and the ALJ gave this recommendation "weight." (Tr. 23, 761). Plaintiff maintains that the RFC—which limits Miller to "occasional" bending—does not accommodate Dr. Metz's limitation, because the ALJ ought to have identified how often Miller could "repetitively" bend. (Tr. 17). This argument lacks merit. Dr. Metz's report contains no definition for the terms "occasional" or "repetitive." By the terms' plain meaning, "occasional" is less frequent in nature than "repetitive."[4] In finding that Miller was capable of only "occasional" bending, the ALJ's RFC precluded any type of "repetitive bending." (Tr. 23). As a result, the ALJ did not need to include a separate restriction in the RFC to address how often

---

[4] The Social Security guidelines define "occasional" to be up to one third of the time. *Clemmons v. Astrue*, No. 1:10-CV-902, 2012 WL 219512 (S.D. Ohio Jan. 25, 2012) *report and recommendation adopted sub nom. Clemmons v. Comm'r of Soc. Sec.*, No. 1:10-CV-902, 2012 WL 554423 (S.D. Ohio Feb. 21, 2012). There does not appear to be a definition for the term "repetitive." Even so, it would be unreasonable to conclude that a limitation to occasional bending does not prohibit repetitive bending.

Plaintiff could perform "repetitive bending," because the RFC already prohibits bending at such a frequency.

Regarding Dr. Covington, Miller takes issue with the ALJ's failure to discuss the doctor's findings that he had been disabled since 1999 and was severely impaired in his home, recreational, and social activities. This argument also fails. It is well-established that only *medical opinions* issued by physicians are entitled to deference. *Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 492-93 (6th Cir. 2010) (*citing* 20 C.F.R. §§ 404.1527(d), 416.927(d)). Opinions on issues reserved to the Commissioner—such as whether the claimant is disabled or employable—are not medical opinions, nor deserving of any particular weight. *Id.* (*citing* 20 C.F.R. §§ 404.1527(e), 416.927(e)). Admittedly, the ALJ could have described Dr. Covington's finding that Plaintiff was disabled and confronted it directly, but her failure to do so does not undermine the fact that this portion of Dr. Covington's opinion was not controlling or entitled to deference. In regard to the doctor's description of Plaintiff's activities, an ALJ is not required to discuss each and every piece of evidence in the record for a decision to stand. *See, e.g., Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004). As a result, the ALJ did not err in failing to discuss this piece of evidence. Additionally, the ALJ accounted for evidence of Miller's activities, including testimony and other reports, which indicate that Miller was quite active after Dr. Covington authored his statement. (Tr. 22-23, 586, 735, 1282).

Plaintiff also alleges the ALJ ought to have addressed Dr. Zellers's February 2004 opinion, in which the doctor restricted Miller to a modified range of sedentary work. (Tr. 1140). While the ALJ did not expressly discuss Dr. Zellers's opinion, a reading of the ALJ's decision shows that she considered the physician. The ALJ specifically recounted that Dr. Metz found Dr. Zellers's February 2004 RFC to be an accurate assessment of Plaintiff's capabilities. (Tr. 23).

Despite his agreement with Dr. Zellers, Dr. Metz found that Plaintiff was capable of a greater range of sedentary work. The ALJ discussed Dr. Metz's opinion, adopting some of the doctor's findings and not others. (*Id.*). Such rationale would apply to Dr. Zellers's opinion as well, providing the Court with a sufficient understanding as to why the ALJ did not credit the opinion. However, given that remand is necessary on other grounds, the ALJ may wish to address Dr. Zellers's opinion.

### 2. Dr. Toletino

According to Plaintiff the ALJ failed to mention or consider Dr. Toletino's opinion that Miller must avoid prolonged standing and elevate his feet. Plaintiff's argument that the ALJ violated the treating physician rule in doing so has numerous flaws.

First, Dr. Toletino did not recommend such limitations. The medical record Plaintiff cites to describes a treatment session at MetroHealth in July 2010. (Tr. 1665-68). Plaintiff was seeking relief for leg edema, an open leg wound, and other health issues. Miller treated with Ms. Atlas, a certified nurse practitioner, who recommended that he elevate his feet and avoid prolonged standing to alleviate edema. (Tr. 1668). Ms. Atlas referred Miller to general surgery for wound treatment. (*Id.*). While at some point during this treatment session Dr. Tolentino was present, the record merely reflects the doctor's agreement with the surgery referral. (Tr. 1668). Dr. Tolentino did not address the restrictions Ms. Atlas suggested. Even if Dr. Tolentino had recommended such limitations, he had not established a sufficient treatment history with Plaintiff to rise to the level of a treating source, as he had seen Plaintiff on only this occasion.

Additionally, as the Commissioner notes, Plaintiff has not shown that the limitations Ms. Atlas recommended were intended to be permanent; rather they were temporary, designed to alleviate swelling Plaintiff then-experiencing. Miller does not cite to evidence showing that this

symptom persisted for a substantial period of time following treatment with Ms. Atlas. Accordingly, Plaintiff's argument is not well-taken.

### 3. Dr. Zuchowski

A letter from Dr. Zuchowski indicates that she began treating Plaintiff as least as early as 2005 at the Far West Center for mental health issues. (Tr. 600). The psychiatrist treated Plaintiff on multiple occasions, and the Court will assume for the purposes of this review that she is a "treating source."

Plaintiff asserts that the ALJ's treatment of Dr. Zuchowski violated the treating physician rule, but he articulates no limitations that the psychiatrist recommended and the ALJ subsequently failed to credit. Miller only recounts notations of symptoms, such as low stress tolerance and difficulty working with others. Nor does Plaintiff give any specifics as to how the ALJ's treatment of Dr. Zuchowski was incongruent with the treating source doctrine.

In his opinion, the ALJ discussed treatment notes from the Far West Center and cited to records from Dr. Zuchowski, showing that the ALJ accounted for evidence from the psychiatrist when conducting her review. (Tr. 22). Additionally, two state agency physicians had the opportunity to review Dr. Zuchowski's treatment notes, and other treatment records involving mental health, when forming their opinions, and accounted for the majority of symptoms Plaintiff cites, including depression, difficulties with stress, working with others, and being around others. (Tr. 1473). The ALJ fully credited the state agency opinions in making the disability determination. (Tr. 24). Even though the ALJ must clarify his opinion with regard to the quota limitation suggested by the state agency physicians, as will be discussed further herein, the Court does not find merit to Plaintiff's treating source argument with regard to Dr. Zuchowski.

## C. The ALJ's Finding at Step Five

Miller asserts that the ALJ's finding at step five of the sequential analysis is not supported by substantial evidence because the hypothetical question posed to the VE, and relied upon by the ALJ, did not accurately portray his limitations.   Plaintiff notes a number of limitations which he purports ought to have been included in the controlling hypothetical and RFC.

At the fifth step of the disability determination, the burden shifts to the Commissioner to prove the existence of a significant number of jobs in the national economy that a person with the claimant's limitations could perform. *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999). To meet this burden, there must be a finding supported by substantial evidence that the claimant has the vocational qualifications to perform specific jobs. *Workman v. Comm'r of Soc. Sec.*, 105 F. App'x 794, 799 (6th Cir. 2004) *(quoting Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987)). Substantial evidence may be produced through reliance on the testimony of a VE in response to a hypothetical question, but only if the question accurately portrays the claimant's individual physical and mental impairments. *Workman*, 105 F. App'x at 799 *(quoting Varley*, 820 F.2d at 779).

### 1.  Restrictions Recommended by Dr. Zwissler

Plaintiff argues that the ALJ failed to include a restriction as to production quotas, despite the fact that state agency physician Dr. Zwissler opined Plaintiff could not perform tasks with strict production quotas and the ALJ gave full weight to the doctor's opinion.   The Commissioner argues that the ALJ's assignment of full weight did not require the ALJ to adopt Dr. Zwissler's opinion in its entirety and other evidence in the record contradicted such a limitation.

Under the Regulations, it is the ALJ's prerogative to determine the RFC. *See* 20 C.F.R. §§ 416.927(d)(2), 416.946(c). Nevertheless, in the present case, the ALJ's opinion is contradictory, and as a result, the Court is unable to ascertain the ALJ's intent regarding the quota limitation. In her opinion, the ALJ expressly described Dr. Zwissler's RFC recommendation: "the claimant retains the capacity for simple repetitive tasks without strict production quotas, unexplained changes or working closely with others." (Tr. 24). The ALJ then attributed "full weight" to Dr. Zwissler, indicating an intent to adopt the entirety of the doctor's RFC as it was recounted in the ALJ's opinion. (*Id.*). Yet, the quotas restriction failed to make its way into the RFC. Given that the ALJ attributed such weight to Dr. Zwissler, the RFC ought to have included the quota restriction. What is more, the ALJ also attributed "full weight" to state agency consultant Dr. Katz, who adopted Dr. Zwissler's opinion after conducting a review of the updated record. (Tr. 24, 1659). The VE did not address whether there existed sufficient occupations that would allow for a quota limitation. As a result, the ALJ's finding at this step is not substantially supported. Remand is necessary for the ALJ to clarify his finding as to Dr. Zwissler and Dr. Katz, and if the quotas limitation is adopted, to obtain testimony from the VE regard the limitation's impact on available occupations.

The Commissioner cites to *Wilkinson v. Comm'r Soc. Sec.*, 558 F. App'x 254, 256 (3d Cir. 2014) for the proposition that the ALJ is not required to adopt the findings of a medical source, even though "significant weight" is awarded to the source's opinion as a whole. However, *Wilkinson* is not binding authority upon this Court. Furthermore, its facts are distinguishable from the case at hand. In *Wilkinson*, the ALJ attributed only "significant" weight to the opinion in dispute. *Id.* Here, the ALJ awarded "full" weight to Dr. Zwissler's opinion, indicating a higher level of deference and an intent to adopt the doctor's opinion in total.

23

In addition, the Commissioner argues that remand is not necessary, because the record is inconsistent with and fails to support the quotas restriction. For example, the Commissioner points to treatment notes from Dr. Zuchowski which allegedly show that Plaintiff's ADD was controlled by medication and did not prevent him from taking online classes. The Court agrees that there is some evidence in the record speaking to Plaintiff's ability to meet quotas. The ALJ, however, did not discuss her decision to omit the limitation, and relying on other information in the record to explain the omission would result in the Court engaging in *post hoc* rationalization, which is prohibited. *See Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 192 (6th Cir. 2009); *Martinez v. Comm'r of Soc. Sec.*, 692 F. Supp.2d 822, 826 (N.D. Ohio 2010). Moreover, the ALJ's opinion, as it currently stands, indicates that the limitation was adopted, but inadvertently omitted from the RFC and the controlling hypothetical question.

In regard to Dr. Zwissler, Plaintiff also maintains that the ALJ failed to accommodate the doctor's finding of moderate limitations in maintaining concentration, persistence, or pace. Plaintiff references *Ealy v. Commissioner of Social Security*, 594 F.3d 504 (6th Circ. 2010) in support of his contention that a limitation to simple, repetitive tasks is insufficient to accommodate such moderate limitations.

While the law regarding the application of *Ealy* is unsettled in this jurisdiction, this Court has found that "*Ealy* does not require further limitations in addition to limiting a claimant to 'simple, repetitive tasks' for every individual found to have moderate difficulties in concentration, persistence, or pace." *Jackson v. Comm'r of Soc. Sec.*, No. 1:10-CV-763, 2011 WL 4943966, at *4 (N.D. Ohio Oct. 18, 2011). Instead, "*Ealy* advocates a fact-based approach to determine whether, considering the record evidence, the plaintiff required specific limitations regarding his or her moderate difficulties with concentration, persistence, or pace." *Weagraff v.*

*Comm'r of Soc. Sec.*, No. 1:11-CV-2420, 2013 WL 968268 (N.D. Ohio Jan. 7, 2013) *report and recommendation adopted sub nom. Weagraff v. Colvin*, No. 1:11-CV-2420, 2013 WL 980435 (N.D. Ohio Mar. 7, 2013) (*citing Jackson*, 2011 WL 4943966, at *4).

The Court will not determine whether the ALJ erred in this respect, because remand is required to address the ALJ's treatment of Dr. Zwissler's quota recommendation. The ALJ's finding on the quota limitation may alter the controlling hypothetical question and RFC. At least this Court has found that a hypothetical to the VE limiting the claimant to no quotas or production line work adequately accounted for moderate limitations in concentration, persistence, or pace. *See Schooley v. Astrue*, No. 09-CV-2748, 2010 WL 5283293, at *2 (N.D. Ohio Dec. 17, 2010) (hypothetical limiting the plaintiff to no "high production quotas or piece work" was consistent with a moderate limitation in concentration, persistence, or pace). While addressing the quota limitation, the ALJ ought to give attention to Plaintiff's limitations in concentration, persistence, and pace.

Finally, Plaintiff asserts the RFC failed to account for Dr. Zwissler's limitations prohibiting "unexplained changes" and "working closely with others." (Tr. 1473). The ALJ sufficiently accommodated such restrictions in the RFC by limiting Plaintiff to work that has few workplace changes, minimal contact with the public, and no more than superficial interaction with co-workers and supervisors. (Tr. 17).

### 2. Restrictions Recommended by Dr. McCloud

Plaintiff also alleges that the ALJ ought to have included a number of physical restrictions from state agency reviewer Dr. McCloud in the controlling hypothetical question. The ALJ addressed Dr. McCloud's opinion and attributed different levels of weight to the restrictions the state agency consultant recommended. (Tr. 25).

25

Miller first points out that Dr. McCloud found he could not climb ladders, ropes or scaffolds, but such a limitation was not included in the RFC.  The ALJ gave "weight" to Dr. McCloud's opinion regarding Plaintiff's ability to "climb." (Tr. 25).  It is not clear whether the ALJ's reference to climbing was with regard to ladders, ropes, or scaffolds; to ramps or stairs; or to all of the above. The RFC indicates that Miller can occasionally climb ramps or stairs which reflects Dr. McCloud's opinion to the same. (Tr. 17).  The RFC does not address ladders, ropes, or scaffolds.  Given the lack of clarity on this matter, and that remand is already necessary, the ALJ should address the issue upon reconsideration.

Miller also notes that Dr. McCloud precluded use the right lower extremity for foot controls.  The ALJ recounted that Dr. McCloud imposed such a limitation, but did not state what weight was assigned to such a finding, nor was a corresponding limitation included in the RFC. (Tr. 24-25).  Because remand is necessary on other grounds, the ALJ should address Dr. McCloud's opinion as to this limitation as well.

Finally, Plaintiff maintains that the ALJ should not have given "less weight" to Dr. McCloud's opinion regarding occasional handling and fingering with the right upper extremity. (Tr. 25).  The ALJ did not fully credit such a restriction, because the evidence did not show Miller's right wrist fracture would impose limitations for a period of 12 months or more. According to Plaintiff, the ALJ's reasoning is not substantially supported.  Plaintiff argues that along with fracturing his wrist in October 2009, he also dislocated it, and the dislocation persisted on imaging in August 2010. (Tr. 1681-82).  Plaintiff purports that the ALJ ought to have considered the dislocation.

Medical reports around the time of Plaintiff's wrist injury and first surgery indicate that there was a dislocation of the wrist accompanying the fracture. (Tr. 1283, 1286).  Following the

first surgery, some dislocation of the wrist remained, but Plaintiff was not willing to be admitted for immediate repair. (Tr. 1286).  The August 2010 x-ray Plaintiff cites shows no acute fracture and scapholunate ligament disruption. (Tr. 1681).  Despite such a finding, Plaintiff points to no restrictions imposed by physicians to show that he continued to suffer limitations due to the dislocation more than a year after the injury occurred.  As a result, Plaintiff's argument that the ALJ erred in failing to account for the effects of the dislocation is not well-taken.

### 3.  Additional limitations

Plaintiff also opines that the RFC was flawed in that the evidence does not show he can perform prolonged sitting, standing, or walking.  To support this claim, Plaintiff cites to opinions issued by physical therapists Ellen Straub and Aryeh Weiss, Drs. Zellers and Metz, and Ms. Atlas.

Miller's allegation of error is not well-taken.  The ALJ did not credit the two physical therapists' opinions, and Plaintiff does not assert that the ALJ erred in this regard.  As the ALJ explained, evidence of Plaintiff's physical activities undermined the severity of the physical restrictions Ms. Straub and Mr. Weiss assigned. (Tr. 23).  Turning to Dr. Metz's opinion that Plaintiff could only sit or stand for "brief" periods, the ALJ reasonably assigned "less weight" to the opinion, because the doctor failed to define the term "brief."  Given the lack of specificity, the ALJ reasonably gave "less weight" to such a suggestion, particularly because other medical opinions exist in the record that more precisely identify Plaintiff's ability to sit and stand, including those of the state agency physicians, which the ALJ credited. (Tr. 24-25).  Similarly, Dr. Zellers did not define what "prolonged" sitting entailed, making the ALJ's reasoning as it concerned Dr. Metz applicable.  The ALJ may further address Dr. Zellers's opinion upon remand, as earlier indicated herein.  Finally, Plaintiff puts forth no evidence indicating that the

limitations suggested by Ms. Atlas were intended to last for longer than 12 months, rather than a short period of time to relieve swelling.

Miller also argues that the RFC fails address how often he could repetitively bend or use his lower extremities for pushing or pulling.  Given that the RFC limits Miller to only occasional bending and pushing or pulling with the lower extremities, the ALJ, by default, found that Plaintiff could never repetitively perform such activities. (Tr. 17).

## VII. DECISION

For the foregoing reasons, the Magistrate Judge finds that the decision of the Commissioner is not supported by substantial evidence.  Accordingly, the final decision of the Commissioner is REVERSED and REMANDED for further proceedings.

IT IS SO ORDERED.

s/ Kenneth S. McHargh
Kenneth S. McHargh
United States Magistrate Judge

Date:  August 12, 2014.